## ALLEY v. TEXAS ELECTRIC SERVICE CO.

### No. 1953.

Court of Civil Appeals of Texas. Eastland.

Nov. 24, 1939.

Kirby, King & Overshiner, of Abilene, for appellant.

Mays & Perkins, of Sweetwater, for appellee.

GRISSOM, Justice.

Mrs. Louise Alley, widow of Frank Alley, deceased, for herself and for the benefit of Mrs. Lora Allen, mother of deceased, brought this suit against Texas Electric Service Company for damages caused by the death of Frank Alley, which, plaintiff alleged, resulted from defendant's negligence. Plaintiff alleged that defendant's high line ran across a pasture rented by the Alleys; "that the high line was strung along the poles * * *; that the poles were about thirty feet high, and carried a large 'ground wire' which was attached to the pole near the cross arms carrying the copper, or transmission, wires, which copper wires were then and there transmitting and carrying a large voltage of electricity; that the ground wire, after being affixed to the pole, was carried down the pole to the ground and into the ground to the butt end of the pole; that the ground wire originally was held by two-inch metal staples driven into the pole and over said wire at intervals of about twenty-four to thirty six inches." Plaintiff alleged defendant was carrying electric current on its high line in excess of 10,000 volts on January 30, 1936, at the place in question; that such voltage was highly dangerous to a man if permitted to come in contact with him; that the high line and ground wire were uninsulated; that in the exercise of ordinary care both would have been insulated; that while Frank Alley was lawfully on said land and premises rented by him and "while strolling along the fence next to a public highway, and on the inside of said fence, and under defendant's said high line, he * * * came in contact with the ground wire attached to, or which had been attached to, one of the poles of defendant; and as a result of such contact received a charge of electricity emanating from defendant's said high line, which said charge caused his instant death." Negligence was alleged in permitting the electric current to escape from the high line into said ground wire; in allowing the ground wire to remain highly charged with escaping current from defendant's high line; in failing to have the high line properly insulated so as to prevent the escape of current from the same when coming in contact with other objects, and particularly with said ground wire; in failing to have the ground wire insulated; in failing to reasonably inspect the condition of its high line and ground wire, in order to ascertain whether or not the ground wire had become disengaged from the pole and in contact with the high line.

In the alternative, plaintiff alleged that the high line and ground wire and the flow of electricity through them were under the control of defendant; that plaintiff did not know in what manner her husband met his death "and has no way of proving how it did happen * * * but says that it was brought about through some negligence of the defendant. * * * in the handling of very high and dangerous

voltage of electricity along its high line * * * and in some manner negligently permitting the ground wire, attached to one of its poles, or which had been attached to one of its poles, to become charged with such an amount of electricity emanating from the high line * * * as when coming in contact with the said Frank Alley, to bring about his instant death. That the defendant herein is in a better position to know how the death of Frank Alley * * * came about and what caused it, than is the plaintiff. Plaintiff would further show to the court that in the handling of electricity from point to point through high transmission lines, as was being done in this case, by the defendant, when the proper degree of care is used by those operating such agencies, death does not ordinarily follow the contact of a human being with a ground wire attached to its poles, as in this instance; that the cause of the death of Frank Alley, plaintiff's husband, was proximately brought about by the negligence of this defendant in some manner to plaintiff unknown."

Defendant answered by general demurrer, special exceptions, general denial, plea of two years' statute of limitations, and specially that deceased, just prior to his death, was attempting to remove the ground wire, which was securely attached to defendant's pole, and that in so doing he caused the ground wire to come in such close proximity to the transmission line as to cause the electricity to pass from the transmission line to the ground wire in such amount as to cause his death. That the wire and pole were the property of defendant; that deceased in attempting to remove the same was doing so without the knowledge or consent of defendant. That deceased was guilty of negligence in so attempting to remove said ground wire from said pole which was the sole proximate cause of his death, and if not the sole proximate cause, that such negligence was a proximately contributing cause thereof.

At the close of plaintiff's evidence, the court discharged the jury and rendered judgment for defendant. Plaintiff has appealed.

Plaintiff assigns as error the action of the court in "sustaining defendant's motion to instruct a verdict in favor of the defendant" and in rendering judgment against plaintiff and in favor of defendant. Plaintiff's proposition is stated as follows:

"Where the undisputed evidence showed that the decedent met his death while on premises where he had a right to be, and was killed by a charge of electricity from defendant's high line, received through a ground wire, uninsulated and disengaged from the pole where it had been fastened and lying upon his body; and that the high line and ground wire were in the exclusive care, custody and control of the defendant; in the absence of any explanation from the defendant as to the cause of the death, the evidence was sufficient to warrant the inference that his death was caused by the negligence of the defendant."

The following is, in substance, all the evidence pertinent to the questions to be hereinafter discussed:

Mr. Adams, an undertaker to whom the body of deceased was taken immediately after his death, testified he was of the opinion deceased died from burns.

Plaintiff testified that defendant's high line was situated just inside the fence of the Alley pasture; that the pasture was surrounded by a wire fence; that Raymond Moore and his wife (plaintiff and Mrs. Moore having been reared together) spent the night of January 29, 1936, with the Alleys; that about 2:30 in the afternoon of January 30, 1936, Mrs. Alley and Mrs. Moore went to Roscoe, leaving their husbands at the Alley home; that Mrs. Alley next saw her husband at the undertakers between 3:30 and 4:00 o'clock that afternoon.

W. E. and B. M. Cooper were about a half mile from the Alley home at the time Mr. Alley was injured. The sun was shining but there was snow on the ground and it was slick and muddy. About 2:30 o'clock they heard a noise; almost immediately afterwards they saw Raymond Moore rush from the Alley pasture near the post where deceased was found, waving his arms, calling, and coming toward the Coopers. The Coopers got in a car and went to meet Moore. They stopped at defendant's electric light pole No. 22-2, a short distance from the Alley home and inside the Alley pasture. The Coopers and Moore got out of the car and went under the fence. The bottom wire of the fence was broken about four or five steps from pole 22-2. They found Mr. Alley lying on his back nine or ten feet, southwest of said pole, and about the same distance from the pasture fence. Most of his clothing was burned off. A wire was

laying on him, up his body from his feet. The wire was 25 to 30 feet long. One end of the wire was in the deceased's left hand, or on his hand, and the other end was on the fence. One of the Coopers broke some brush off a bush between Alley's body and the electric light pole and raked the wire off him. They did not know whether there was electricity in the wire. Mr. Cooper did not get any shock. Deceased had a hammer in his right hand. B. M. Cooper testified "I don't know where that wire came from, and I don't know where it went to." According to the Coopers, Raymond Moore just said "He was killed." The Coopers asked him several questions "but he never did tell us."

J. J. McBride went to the electric light pole about 5:00 o'clock p. m. on the date of the accident. He testified the ground wire was not then on the pole, except a little piece sticking out of the ground; that he looked for the ground wire but did not find it; that the small piece of the wire protruding from the ground was "rough like it had been burned, sort of rough around the edge * * * no evidence of hammer marks or anything being prized against the pole." At the time of the trial there was a ground wire on the pole, the top piece of which was attached to the short piece of ground wire attached to the pole and extending about 7 inches above the ground, which short piece was observed there immediately after Alley's injury.

Mr. Zetzman testified he passed the Alley home about 12:30 on the day Alley was killed. He saw two men mending the fence. "They were working on the fence, the way it looked. * * * both of them stopped and it seemed like one of them was mending the fence, taking up the wire, and then they just started walking west and then stopped and picked up the bottom wire of the barbed wire fence, just raised it up and throwed it down again and started on walking again * * *." The men he saw working on the fence were about 200 to 250 yards west of the Alley house and one had a hammer in his hand.

J. C. Barkley testified that in January, 1938, about two years after the death of Frank Alley, he found a piece of wire four to six inches from the electric light pole No. 22–2 and gave it to plaintiff's counsel. This wire was the one exhibited to the jury.

Mr. Bradshaw, a civil engineer, testified the poles were 30 feet high, 10 to 11 inches in diameter, with 3 electric wires at the top of the poles, that the ground wire on pole 22–2 is now spliced at the ground, "the ground wire goes up the pole to just below the bracket or standard on the upper insulator, and looped around the top and stapled down on the outside of the pole." The ground wires on the poles were fastened by two inch staples 24 to 30 inches apart. He examined the piece of the wire found by Barkley in 1938 and testified "one end looks like it has been burned off." He further testified that the ground wire protruding about 7 inches above the surface of the ground appeared to have been burned. "The purpose of that ground wire is or was to arrest lightening, to keep it from running down the line and grounding it. I did not notice any of the ground wires on these poles insulated in any way. The high lines were not insulated in any way. If no electricity has been permitted to enter that ground wire it would not be dangerous to anybody touching it; it is only in the event electricity is permitted to escape into it that it becomes dangerous. They are capable of being insulated to protect people coming in contact with them. Ground wires, in the proper construction, are very seldom insulated in the country; in towns and in areas around where people come in contact with the poles they use a wooden mold to keep anybody from coming in contact with them. This piece of copper wire is insulated, that black stuff on there is to keep the electricity from coming in contact with other wires or from hurting a person that might take hold of it or come in contact with it. * * *

"If electricity is not permitted to escape into a ground wire it is not dangerous to anybody; it is perfectly safe, but if electricity is permitted to escape into it it becomes dangerous. It is just like a lightening rod on the side of a house, you can hold it all day, but if lightening should strike it it will kill you.

"If lightening should strike one of the wires carrying electricity, the purpose of the ground wire is to ground it down into the ground and kill it; it might kill itself at the top of the ground, but that is not often done. Lightening can do anything and does do all sorts of things; you can't control it; it will split a pole all to pieces, and it will tear the ground wires loose from

the poles. I recently saw about a mile of poles that wasn't grounded and it split some of them, broke some of them in two; every pole was damaged in some way.

\* \* \*

"The top insulator is about six feet from the cross arm. The ground wire runs up that pole to just below the upper insulator.

\* \* \*

"If this ground wire should become loosened and was hanging out there by itself and it should come in contact with these wires charged with electricity it would be very dangerous. It would not be dangerous unless somebody touched it. If it was just hanging up there it would just hang there like a kite string, but the minute it comes in contact with the ground it becomes dangerous, and would probably produce death to anybody that touched it. The only way that I could see that would cause the wire to burn off the way I saw the condition there; if there happened to be a flaw in the wire or if that ground was wet there and maybe lightening hit the messenger wire or static wire at the top and come down through there (indicating on plat) it might fuse right at the top of the ground, maybe snow, ice, or something of that kind, or water. In my opinion that would be the only thing that could do it. If it was disconnected at the top, the ground wire was disconnected at the top, there still wouldn't be any danger unless it somewhere came in contact with the high line. \* \* \*

"The purpose of a ground wire on an electrical transmission line is to protect the particular pole from lightening and the line, too, and to ground the lightening if it does strike the pole."

O. S. Hockaday, an electrical engineer, employed by defendant, testified, among other things, as follows:

"On January 30, 1936, the Texas Electric Service Company was operating an electric high line between Sweetwater and points west, through Sweetwater and Colorado. The voltage of that line is about sixty-five thousand, that is what we consider one wire to another; one of those conductors to the ground would be about 35000 voltage. Yes, if a person came in contact with it it would kill him; it was sufficient that if a person came in contact with that voltage it would kill him. A person standing on the ground would be perfectly safe if it was in proper condition, and all construction is made in accordance with the American ——— Safety Code. If a metal wire should come in contact with one of those high lines carrying the amount of electricity that I stated, and a person should walk up and take hold of it, if that wire was disconnected from the ground it would undoubtedly kill him.

"There has been a great deal of research in the last ten or fifteen years and those ground wires are put on the poles for the purpose of protecting the system, particularly from lightening, and their protection to the line by protecting the pole itself, from being split in the event the pole is struck by lightening. When they are properly maintained on those poles they are harmless, and if a person should touch one of them it wouldn't kill him.

"Q. It is only when they get charged with electricity that it is dangerous, those ground wires, that is true? A. You are getting into a technical point there.

"Q. I say they would have to be charged with electricity? A. As long as the lower end is connected they are not particularly dangerous to a person even though they do carry electricity.

"Q. In other words, you say if they were properly connected down at the ground and a connection was made with the high line up at the top it wouldn't be dangerous to anybody to walk up and take hold of them? A. Not particularly; you are getting into another technical problem.

"When current goes through a wire and some other object such as a person touching it, parallel with it, the current may divide. Ordinarily a person might receive a slight shock in the event the electricity comes down the wire, but it wouldn't necessarily be fatal.

"In the event, if for any reason, that ground wire should be jerked loose from the pole, and with one end of it contacting the high line, one of those high lines carrying that voltage of electricity, and a person should come up and catch hold of it, it would be dangerous, and it would very likely kill him.

"I went out to pole 22—2 on the morning following January 30, 1936. I made a very diligent examination of the pole and everything around there. I made a very careful survey of everything around the pole and on the ground and there were no pieces of wire laying on the ground within a radius, I will say, of forty or fifty feet of the pole. There was a piece of the ground

wire coming out of the ground and extending up a distance of about 7 inches along the pole when I was there that morning. I hardly see how either one of those pieces of wire (indicating) could be a piece of the ground wire that I saw there coming up out of the ground, because the same wire is still there in service. * * *

"I am familiar with the construction of those high line poles. along adjacent to pole 22—2. On January 30, 1936, they all carried ground wires. At the time I was there on January 31, there was no ground wire on pole 22—2 except the short length that went into the ground; the ground wire above that had disappeared."

Raymond Moore did not testify. His failure to do so is not in any way accounted for. No evidence was introduced by defendant.

By its counter propositions defendant contends, in substance, that the res ipsa loquitur rule does not apply (1) unless the evidence shows, among other things, that the instrument causing the injury was not meddled with by the injured party; (2) where the evidence fails to negative the reasonable probability that the injury complained of resulted from some cause other than negligence of defendant; (3) that the rule has no application unless the circumstances surrounding the injury render it more probable that the injury was due to negligence of defendant than otherwise; (4) that under said rule a plaintiff will not be permitted to recover where it is merely presumed that a condition existed from which negligence and proximate cause may be presumed or inferred, but plaintiff is required to prove the facts from which negligence and proximate cause may reasonably be inferred.

Assuming that the evidence shows, or is sufficient to justify a finding, that deceased was killed by a charge of electricity coming from defendant's high line, still the evidence fails to show what caused the charge of electricity to come from the high line and in contact with deceased, and fails to show a defective condition of defendant's ground wire at the time deceased came on the scene on the day he was killed, does not show that the high line and ground wire were not meddled with by deceased or others (except by a showing that there were no hammer or "prized" marks on pole 22—2), and otherwise failed to show the conditions and circumstances ex-isting at the time of injury, despite the fact that the only known witness who evidently knew what happened refused to disclose the facts to the witnesses who appeared at the scene very soon after the accident, did not testify, and his failure to testify was not accounted for, although he apparently was a friend of the deceased and the plaintiff.

Mere proof of an injury, in the absence of proof of the manner in which it was received, and the circumstances attending the occurrence thereof, is insufficient to warrant an inference of negligence on the part of a defendant, and to invoke the res ipsa loquitur doctrine.

In Texas & Pacific Coal Co. v. Kowsi-kowsiki, 103 Tex. 173, 125 S.W. 3, 4, where an employee was killed by the derailment of a car, Justice Williams said:

"The derailment of the car, unexplained, is a fact which by its very nature may be admitted to suggest something amiss, a want of proper precaution somewhere. But what was the cause of the derailment? Until we can answer that question, we think it must be admitted that it is not shown by the evidence that the particular thing which caused this injury was in the exclusive management of the defendant. If everything that could reasonably be assigned as the cause of the derailment had been wholly under the control of servants of defendant other than the deceased himself, it might be inferred that the cause, whatever it was, consisted in some negligent act or omission of theirs. But we have a track, with its switches, and a motor car, defects in, or negligent management of, any of which might have brought about that which happened. The deceased himself had a hand in the management of the switches, and also in controlling the movements of the car, in so far as it depended on the giving of signals. Negligence is not to be imputed either to him or to the defendant's other servants without proof; and a state of facts in which the cause of the accident cannot be found does not warrant a conclusion that one, rather than the other, produced it. We cannot presume in favor of one and against the other. Evidence must be brought by a plaintiff, having the burden of proof, sufficient to justify an inference of negligence on the part of the defendant, and none such can be drawn from an occurrence which, while indicating negligence somewhere, is as

consistent with the hypothesis that it was his own, or that of one in whose right he sues, as that it was that of the other party.

\* \* \*

"Again it is said that the defendant was in a position to clear away all these doubts. This consideration has force where a plaintiff has proved a state of facts which, while not free from question, is yet sufficient, in the absence of explanation, to give rise to an inference of negligenec on the part of defendant. But it has no application where the facts shown are equally consistent, as they are in this case, with all these hypotheses, viz., that the injury was caused (1) by the negligence of deceased, or (2) by that of defendant, or (3) by that of both deceased and defendant. 6 Thompson on Neg. § 7698 and cases cited. The defendant certainly is not called upon to account for the conduct of the deceased."

In McCray v. G., H. & S. A. Ry. Co., 89 Tex. 168, 34 S.W. 95, 96, our Supreme Court held that proof of the accident and injury alone were not sufficient to authorize a recovery, but that proof of the circumstances attending the injury may, without direct evidence, be sufficient to establish the fact of negligence. Judge Brown, in the opinion in said case, quoted from the opinion in Texas & N. O. Ry. Co. v. Crowder, 63 Tex. 502, as follows: " 'The burden of proof resting on a plaintiff upon the issues of negligence of the defendant and his own exercise of due care requires that he should show the facts surrounding and leading to the accident, and if from these, when shown, a jury may reasonably infer negligence in the defendant contributing to the injury, and the exercise of due care by the plaintiff, then he is entitled to a verdict; but, if he does not show how the accident occurred by which he was injured, by showing his own relation to it, and the other surrounding facts, some or all of which may appear from the character of the accident itself, then he has not gone with his evidence as far as the law requires him to go to authorize a recovery.' "

In Texas & N. O. Ry. Co. v. Crowder, 63 Tex. 502, Justice Stayton also said:

"As this case is presented, to assume that there is sufficient evidence to establish that the injury was caused by the negligence of the appellant, we would have to rely solely upon the fact that the part of the track where the deceased was found may not have been in good order, when, if this be admitted, it is but a fact which may not in the slightest degree have caused the injury. That may have resulted solely from some negligent act of the deceased. What he was doing or attempting to do does not appear. Whether he went on the track in the discharge of his duties without knowledge of the defective condition of the track, or attempted to perform, some act not prudent while the train was in motion, or fell from the train through want of due care, the evidence does not show.

"Many cases exist in which it has been held that evidence fully as strong as that found in the record is insufficient."

In St. Louis, S. F. & T. Ry. Co. v. Cason, 59 Tex.Civ.App. 323, 129 S.W. 394, 398, Judge Speer stated the rule as follows: "The logical rule undoubtedly is that, unless the circumstances surrounding the injury render it more probable that the injury was due to the negligence of the defendant than otherwise, the act speaks nothing within itself and affords no just inference against the defendant, and the doctrine or res ipsa loquitur has no application to the case."

In Galveston, H. & S. A. Ry. Co. v. Landeros, Tex.Civ.App., 264 S.W. 524, 527, Judge Graves said: "The net effect of this testimony, when boiled down, is that an injury to the man's eye occurred under the general circumstances the two witnesses tell about, but, by all the authorities, proof of that fact alone, whether under the application of the rule of evidence designed by the phrase 'the thing itself speaks,' or otherwise, affords no evidence whatever of either negligence or responsibility for it; while direct proof is not necessary, there must at least be enough shown, in addition to the injury itself, to reasonably establish or justify the inference of a causal connection between it and some violated duty on the part of the one sought to be held."

In Bonner v. Texas Co., 5 Cir., 89 F.2d 291, 294, the court said: "Since it does not appear what caused the explosion, one can only guess whether it was due to something that Bonner did or omitted, or to something not within his duty or control. Nor can it be said on the evidence whether the cause lay in the general conditions for which Texaco Can Company was responsible or in something suddenly done by the Texas Company. When there is no direct evidence, and the proven circumstances are consistent with either of two theories, and there is nothing to show that one rather

than the other is correct, neither is proven. If the plaintiff's right must rest on only one of them, recovery cannot be had. * * Res ipsa loquitur does not help, for that doctrine applies only when the instrumentalities causing injury are shown to have been wholly in the care of defendant, and not to have been meddled with by the person injured or outsiders."

In United States v. Porter Bros. & Biffle, 5 Cir., 95 F.2d 694, 698, the court said: "The doctrine of res ipsa loquitur is restricted in its application to cases where the defendant had exclusive control of the thing which caused the injury, the party injured was without fault, and the injury was such as in the ordinary course of things would not have occurred if the one having such control had used proper care. In the absence of an explanation in such cases, the court may presume that the injury arose from the defendant's want of care, but the presumption does not reasonably follow unless all other conclusions are fairly excluded."

In Paris & G. N. Ry. Co. v. Robinson, 53 Tex.Civ.App. 12, 114 S.W. 658, 662, the court said: "* * * the judgment should not be permitted to stand. For the record fails utterly to show how deceased got from the train and to his death. He may have jumped from the window or fallen from the platform. He may have been thrown by some one from a window or the platform. The doctrine of res ipsa loquitur does not apply. That doctrine has no application 'unless the thing causing the accident is under the control of the defendant or his servants, and the accident is of a kind which does not ordinarily occur if due care has been exercised.' 6 Thompson on Negligence, § 7635. Here the testimony fails to show what caused the accident. Until this primary fact was shown, an inference of negligence from it, of course, could not be drawn. It devolved on appellees, by evidence competent for the purpose, to show negligence on appellant's part. No such evidence is in the record before us. It was contended in the argument that an inference of the existence of facts showing negligence might be drawn from the failure of appellant to show by its conductor and trainmen the knowledge, if any, possessed by them of the occurrence. But this, we think, could not be done. Until facts showing prima facie a liability on its part had been proven, appellant was not called upon to offer evidence at all."

In Davis v. Castile, Tex.Com.App., 257 S.W. 870, 872, Judge German said:

"Again, where the evidence shows that the accident may have happened as the result of one of two or more causes, and it is not more reasonably probable that it was due to the negligence of the defendant than to any other cause, the rule of res ipsa loquitur does not apply. Patton v. Ry. Co., 179 U.S. 658, 21 S.Ct. 275, 45 L.Ed. 361. St. Louis, S. F. & T. Railway Co. v. Cason, 59 Tex.Civ.App. 323, 129 S.W. 394. Texas & P. Coal Co. v. Kowsikowsiki, supra.

"The Supreme Court of Wisconsin has recently stated this principle in this language:

" 'The jury could have done no more than guess as to whether the accident was the result of careless and negligent operation of the car or of the blowout. Verdicts cannot rest upon guess or conjecture. It is the duty of the plaintiff to prove negligence affirmatively; and, while the inferences allowed by the rule or doctrine of res ipsa loquitur constitute such proof, it is only where the circumstances leave no room for a different presumption that the maxim applies. When it is shown that the accident might have happened as the result of one of two causes, the reason for the rule fails, and cannot be invoked.' Klein v. Beeten, 169 Wis. 385, 172 N.W. 736, 5 A.L.R. 1237."

We are of the opinion that the court did not err in rendering judgment for defendant. The cause of the accident is not shown. " * * * a state of facts in which the cause of the accident cannot be found does not warrant a conclusion that one, rather than the other, produced it." The facts shown "are equally consistent * * * with all these hypotheses, viz., that the injury was caused (1) by the negligence of deceased, or (2) by that of the defendant, or (3) by that of both deceased and defendant. * * * The defendant certainly is not called upon to account for the conduct of the deceased." Texas & P. Coal Co. v. Kowsikowsiki, 103 Tex. 173, 175, 125 S.W. 3, 4. Plaintiff has not shown the facts surrounding and leading to the accident; having failed to show how the accident by which Alley was injured occurred, and having failed to show Alley's relation to or connection with it, and having failed to show the condition of defendant's property at the time deceased ar-

rived on the scene, plaintiff's evidence was insufficient to authorize a judgment against the defendant.

■ The evidence may be sufficient to justify a finding that deceased was killed by a charge of electricity emanating from defendant's high line. The evidence wholly fails to show what caused the electricity to come from defendant's high line thirty feet in the air and in contact with deceased. Plaintiff's expert witness testified: "I examined the poles, I found the nature of the construction of the high line on the Duncan property (rented by Alley) to be good construction." The ground wires, which were buried in the ground the same depth as the poles, went up the poles to just below the bracket or standard on the upper insulator, and were looped around the top and stapled down on the outside of the poles. The ground wires were simply lightening rods about as big around as an ordinary pencil. The ground wires apparently were securely fastened to sound poles by approximately two inch staples about 24 to 30 inches apart. The ground wires and high lines were not insulated. Plaintiff's expert witness testified: "Ground wires, in the proper construction, are very seldom insulated in the country * * *. The top insulator is about six feet from the cross arm. The ground wire runs up that pole to just below the upper insulator." There is no evidence that the ground wire on pole 22—2 was ever constructed or maintained differently than the way it was after it had been replaced subsequent to Alley's death. There is no evidence that the ground wire had been dislodged from the pole at the top and forced in contact with, or close proximity to, defendant's high line, prior to the time deceased came on the scene. There is no evidence that the ground wire near the ground, or along the side of the pole, was loose from the pole and hanging there when deceased came to that place. From the evidence adduced the questions of how the accident occurred and what part deceased played in producing it, if any, if it had been submitted to a jury would have been purely matters for conjecture and speculation by the jury. There was evidence that lightening could tear the ground wire loose from the pole. There was no evidence of lightening in that vicinity at any time. It would seem necessary to support plaintiff's theory and proposition to presume that at the time plaintiff came upon the scene of the accident the ground wire on pole 22—2 was detached from the pole and at the top had come in contact with defendant's high line, and then from such (or similar) presumed facts infer that such presumed condition was the result of defendant's negligence. This cannot be done. The facts from which negligence may be inferred must be proved and cannot be themselves presumed. Smith v. Pennsylvania Ry. Co., 2 Cir., 239 F. 103; Davis v. Castile, Tex. Com.App., 257 S.W. 870; Patton v. Public Service R. Co., 3 Cir., 227 F. 810; Chicago, R. I. & G. Ry. Co. v. Rhone, Tex. Civ.App., 105 S.W.2d 707; Missouri Pac. Ry. Co. v. Porter, 73 Tex. 304, 11 S.W. 324; Johnson v. Texas & P. Ry. Co., Tex. Civ.App., 117 S.W.2d 864; Community Natural Gas Co. v. Henley, Tex.Com.App., 24 S.W.2d 10.

■ The witnesses who saw the wire on the deceased's body and brushed it off and who say that one end was on, or in, his hand and the other end across the wire fence, do not attempt to say that it was defendant's ground wire, or that said wire was charged with electricity. From their testimony it may as reasonably be inferred that said wire was a piece of the fence, or some wire taken there by deceased, as to presume or infer it was defendant's ground wire. The testimony of all of plaintiff's witnesses who testified relative thereto show that the wire, which immediately after the accident was found running from deceased's hand to the fence, was removed from the premises soon after the accident. Yet plaintiff produced on the trial a ground wire found by Barkley, four to six inches from pole 22—2, two years after Alley's death. But, assuming that the evidence is sufficient to sustain a finding that it was defendant's ground wire that was found on defendant and running from his hand to the fence, we think the evidence still is insufficient to authorize a recovery.

The cause of the accident is not shown. 45 C.J. 1200; Texas & P. Ry. Co. v. Kowsikowsiki, 102 Tex. 173, 125 S.W. 3; Paris & G. N. Ry. Co. v. Robinson, 53 Tex.Civ.App. 12, 114 S.W. 658; Galveston, H. & S. A. Ry. Co. v. Landeros, Tex.Civ. App., 264 S.W. 524. The circumstances surrounding the injury and defendant's connection and relation thereto are not shown. 45 C.J. 1200; Texas & N. O. Ry. Co. v. Crowder, 63 Tex. 502, 504. It is not shown that the high line or ground

wire was not tampered or meddled with by deceased or others. Johnson v. T. & P. Ry. Co., Tex.Civ.App., 117 S.W.2d 864; Bonner v. Texas Co., 5 Cir., 89 F.2d 291; Blanton v. Great A. & P. Tea Co., 5 Cir., 61 F.2d 427; United States v. Porter Bros. & Biffle, 5 Cir., 95 F.2d 694, 698. The condition of defendant's property when Alley came on the scene is not shown. In other words, the facts surrounding and leading to the accident from which a jury might reasonably infer negligence in the defendant, are not shown. The meager facts shown are as consistent with the hypotheses that the injury was caused by the negligence of the deceased as the negligence of the defendant. Davis v. Castile, Tex. Com.App., 257 S.W. 870; 30 Tex.Jur. 805. A verdict based on such evidence could only be based upon conjecture and speculation. Houston, E. & W. T. Ry. Co. v. McHowell, Tex.Civ.App., 278 S.W. 258, 261; Mauk v. Texas Pipe Line Co., Tex.Civ. App., 93 S.W.2d 820. Furthermore, here it is apparent there was an eye witness to the unfortunate accident who could testify as to what happened, thus obviating the necessity of reliance upon the res ipsa loquitur doctrine. A plaintiff must produce all available evidence before he is permitted to rely upon that doctrine. 45 C.J. 1200.

The judgment is affirmed.